NOT FOR PUBLICATION                                      (Document No. 16)

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**
**CAMDEN VICINAGE**

_____
                                :
DENNIS MEHR and               :
MICHELE MEHR,              :
                                :
                Plaintiffs,    :     Civil No. 12-4499 (RBK/AMD)
                                :
        v.                 :     **OPINION**
                                :
                                :
ATLANTIC CITY, et al.,       :
                                :
                Defendants.  :
_____ :

**KUGLER**, United States District Judge:

      This case arises out of Atlantic City Police Officer Thomas Moynihan's arrest of Plaintiff

Dennis Mehr ("Mehr") at the Resorts Casino Hotel in Atlantic City, New Jersey.

      Mehr brings claims against Officer Moynihan ("Moynihan"), the City of Atlantic City

("Atlantic City"), Atlantic City Police Department Chief of Police Ernest Jubilee ("Jubilee"),

Atlantic City Public Safety Director Christine Petersen ("Petersen") (collectively, "Defendants"),

and numerous other named fictitious individuals.  Plaintiff's wife, Michele Mehr, brings her own

claim against Moynihan.

      Currently before the Court is Defendants' motion for summary judgment.  (Doc. No. 16.)

For the reasons that follow, Defendants' motion will be granted in part and denied in part.

## I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY[1]

On May 21, 2011,[2] Mehr visited the Resorts Casino Hotel (the "Casino") with his two

sons, Dennis and Kyle, his friend Robert Coleman, and Robert Coleman's wife to watch the

Colemans' son compete in an Ultimate Fighting Championship ("UFC") match.  (Defs.'

Statement of Undisputed Material Facts ("Defs.' SMF") ¶ 11; Pls.' Response to Defs.' SMF

("Pls.' Response") ¶ 11.)

At one point during the fight, the Colemans' son knocked down his opponent and Mehr,

along with his friends and family, jumped up and started cheering.  (Id. ¶ 12.)  Shortly thereafter,

the promoter of the UFC match came over to Mehr and his group and asked some of them to

leave.  (Id. ¶¶ 12-13.)  Mehr complied with the promoter's request and left the arena, but later

returned wishing to apologize for what had transpired.  (Id. ¶ 14.)  Once Mehr re-entered the

arena, the promoter "jumped up on a table and started screaming at [Mehr] to leave."  (Id. ¶ 15.)

Security Officer Rony Melidor, a Casino employee, was working the UFC fight that

evening.  Around 10:00 p.m. he saw event security wrestle with Mehr.  (Ex. E to Pls.' Opp'n to

Defs.' Mot. for Summ. J. ("Pls.' Opp'n Br."), Resorts Employee Incident Report dated May 21,

2011 ("Melidor Report"); Ex. F to Pls.' Opp'n Br. (Melidor Dep.) 38:4-40:25; 43:6-45:25).)

Melidor was told by event security that Mehr needed to leave the arena, and so he promptly

---

[1] When considering a defendant's motion for summary judgment, the Court views the facts underlying the claims in the light most favorable to the plaintiff.  See Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc., 998 F.2d 1224, 1230 (3d Cir. 1993).

[2] There is some contradiction in the record as to what night Mehr actually attended the Resorts Casino Hotel. Plaintiffs and Defendants both note in their Local Rule 56.1 Statements that Mehr visited the casino on May 21; however, certain documentary evidence indicates that it could have been May 19 or May 20.  (See Ex. C to Pls.' Opp'n to Defs.' Mot. for Summ. J. ("Pls.' Opp'n Br."), Atlantic City Police Dept. Initial Report by Moynihan dated June 1, 2011 ("Moynihan Report"); Ex. E to Pls.' Opp'n Br., Resorts Employee Incident Report dated May 21, 2011 (stating that incident occurred on May 20).)  This is immaterial for purposes of resolving the instant motion.

escorted him outside.  (Id.)  Although Melidor observed that Mehr was drunk, he noted that

Mehr complied with his request to leave the arena without incident.  (Melidor Dep. 38:4-40:25;

43:6-45:25.)  Once outside the arena, Mehr asked Melidor if he could wait for his kids and

Melidor told him that would be fine.  (Id. 45:5-25.)

Moynihan happened to be working a detail at the Casino that same night.  (Defs. SMF ¶¶

1, 6; Pl.'s Response ¶¶ 1, 6.)  At some point after Mehr was escorted out of the arena, Moynihan

observed Mehr "screaming and yelling at [ ] security guards."  (Ex. D to Pls.' Opp'n Br.

(Moynihan Dep.) 24:2-22.)   As Moynihan approached Mehr and the security guards, one of the

security guards told him that Mehr was out of control and needed to leave the property.  (Ex. C

to Pls.' Opp'n Br., Atlantic City Police Department Initial Report by Moynihan dated June 1,

2011 ("Moynihan Report").)  Mehr then began to scream at Moynihan.  (Id.)  Moynihan asked

Mehr "to calm down and stop yelling," but Mehr continued to yell.  (Id.)  Based on his

observations, Moynihan concluded that Mehr's "aggression" appeared to be directed towards

security personnel, so he asked Mehr to come out into the hallway and speak with him there.

(Id.)  Mehr refused and continued screaming, "I'm not going anywhere" and "I want his name."

(Id.)  Moynihan informed Mehr that he could not give out the security guards' personal

information, but would complete a police report on Mehr's behalf if he would agree to step

outside and speak with him.  (Id.)

Moynihan ordered Mehr to "walk out into the hallway several more times," (Moynihan

Report), but Mehr refused and indicated that he would not leave without his children, who were

still in the arena.  (Defs.' SMF ¶ 17; Pls.' Response ¶ 17.) Moynihan also advised Mehr that he

would be physically removed from the arena and placed under arrest if he did not comply with

Moynihan's orders.  (Moynihan Report.)  Moynihan then attempted to physically escort Mehr from the arena.  (Id.)  According to Moynihan, Mehr was not cooperative, grabbed onto the wall, and stated "I aint fucking leaving."  (Id.)  After a brief struggle, however, Moynihan was able to escort Mehr into a corridor.  (Id.)

According to Moynihan, Mehr continued to refuse to leave the Casino and continued to yell.  (Id.)  Mehr also waived his hands in Moynihan's face and bumped him with his chest.  (Id.)  As Mehr continued to act out, a large crowd began to gather around both men and film the scene with their cellular phones.  (Id.)  Mehr continued to scream profanities and "bump into" Moynihan, even after he was advised to calm down.  (Id.)  After Mehr again refused to leave the Casino, Moynihan advised Mehr that he was under arrest and ordered him to place his hands behind his back.  (Id.)

According to Moynihan, Mehr immediately resisted arrest, grabbed hold of Moynihan's uniform shirt, and attempted to pull Moynihan to the ground.  (Id.; see also Moynihan Dep. 23:2-8)  Mehr also ripped the front of Defendant Moynihan's shirt before Moynihan was able to wrestle Mehr to the ground.  (Id.)  Mehr then continued to fight with Moynihan and refused Moynihan's commands to "'stop resisting' and 'put your hands behind your back.'"  (Moynihan Report.)

Naturally, Mehr has a different perspective on this encounter.

According to Mehr, Moynihan grabbed him out of nowhere and started shoving him backwards.  Moynihan eventually ran Mehr into a wall and both men fell to the ground.  (Ex. G to Pls. Opp'n Br. (Mehr Dep.) 107:12-109:17 ("he grabbed me by the shirt and charged me into the wall . . . [m]y back hit the wall.  Then we flipped onto the ground.  I landed face first").)  It

4

was during this portion of the encounter that Mehr believes Moynihan's shirt was ripped.  (See id. 109:10-21 ("He grabbed me and just charged me into the wall, and I was like tripping backwards.  And I believe his shirt got ripped because I was like reaching because he was running me backwards so hard . . . .").)  Melidor, the Casino security guard, testified that he did not recall seeing Mehr push Moynihan or grab and rip his shirt.  (Melidor Dep. 69:24-70:10.)

Once Mehr was on the ground, Moynihan had Mehr by the wrist and was sitting on top of him.  (Id. 107:12-21, 112:6-10)  Mehr tried to explain to Moynihan that he had previously broken his left wrist, had just had surgery, and that he would put his hands behind his back if given the opportunity to do so.  (Id. 110:17-22.)  Moynihan continued to hold onto Mehr's wrist, however, and began to twist his arm saying that Mehr was resisting arrest.  (Id. 112:13-16.)  Despite Mehr's pleas, Moynihan continued to twist Mehr's arm until Mehr started to "feel[ ] things pop" and heard something crack in his arm.  (Id.; see also Defs.' SMF ¶ 21; Pls.' Response ¶ 21.)  Mehr told Moynihan that he had just broken his arm, but Moynihan kept applying more and more pressure and Mehr felt something else pop.  (Mehr Dep. 108:8-13.)

Moynihan eventually placed Mehr in handcuffs with the help of several Casino security personnel and escorted Mehr, holding on to his injured arm, to the exit.  (Moynihan Report; Mehr Dep. 119:1-121:15.)

Kyle, Mehr's son, happened to exit the arena as his father was being handcuffed.  Kyle noticed that there were approximately 60 to 70 people gathered around his father and Moynihan, and that these people were "recording [the arrest] and yelling and screaming."  (Id. 27:7-17.)  Kyle noticed that his father's arm was "very white, like paper," and it looked like there was something wrong.  (Ex. H to Pls. Opp'n Br. (Kyle Dep.) 20:19-22:13.)  He also heard his father

inform Moynihan that his arm was broken and dislocated, and that he needed medical attention. Kyle noticed, however, that not only did Moynihan ignore Mehr, but that he continued to "tighten the handcuff[s] and lift [Mehr's] left arm higher."  (Id. 23:10-23.)  Kyle stated further that his father was not resisting Moynihan in any way, he did not try to move his arms or run away, and he was not yelling or screaming.  (Id. 26:11-27:6.)

Dennis, Mehr's other son, corroborates Kyle's testimony.

According to Dennis, once he finished watching the UFC match, he exited the arena and saw approximately 50 to 60 people crowded by the elevator saying that there was a fight.  Dennis looked to see what was happening and realized that the fight was actually Moynihan putting his father in handcuffs.  (Id. 55:5-56:13.)  Dennis also heard his father tell Moynihan that his "arm was bad," and noticed that each time Mehr complained about his arm, Moynihan would lift Mehr's arm higher and make the handcuffs even tighter.  (Id. 56:23-57:13.)  Dennis did notice that his father was trying to pull his arm down "so it wasn't hurting him," but that his father was not yelling, nor was he trying to get away or pull away from Moynihan; in fact, he was being "very cooperative."  (Id. 63:7-64:9.)  Moynihan continued to pull on Mehr's injured arm, and did this about three or four more times.  (Id.)

As a result of Moynihan's alleged conduct during Mehr's arrest, Mehr sustained the following injuries:  "shoulder dislocation requiring reduction; torn capsule; comminuted fracture; left elbow dislocation; fracture of the humeral condyle at the radial capitellum joint; and

significant post traumatic arthritis."  (Pls.' Counterstatement of Material Facts ("Pls.' SMF") ¶

2.)[3]

On July 19, 2012, Mehr and Michele filed suit against Defendants.  (Compl.)  Mehr

brings claims under 42 U.S.C. § 1983 and the New Jersey Civil Rights Act, N.J. Stat. Ann. §§

10:6-1 et seq. (the "NJCRA") against Moynihan and John Does 1-5, for excessive force (Count

One and Count Four).[4]  Mehr also asserts § 1983 claims against Atlantic City, Jubilee, Petersen,

and/or John Does 6-10 for constitutional deprivations due to unlawful customs, practices, or

policies, and inadequate training (Count Two).  The Complaint separately asserts a claim for

prospective injunctive relief against Atlantic City, Moynihan, Jubilee, Peterson, and John Does

1-10 (Count Three).  Mehr also asserts two state law claims against Moynihan:  assault and

battery (Count Five), and intentional infliction of emotional distress (Count Six).  Finally,

---

[3] In addition to the responsive statement of material facts provided for by Local Civil Rule 56.1(a), Plaintiffs have also filed what appears to be their own affirmative statement of undisputed material facts.  The local rules provide for an opponent of summary judgment to file a responsive statement of material facts, which addresses each paragraph of the moving party's statement.  L. Civ. R. 56.1(a).  Plaintiffs have clearly complied with this aspect of the Rule.  Rule 56.1 also permits the party opposing the motion to "furnish a supplemental statement of disputed material facts."  Id. (emphasis added).  However, the Local Rules do not contemplate a nonmoving party furnishing its own statement of undisputed material facts.  Indeed, aside from not being contemplated by the local civil rules, such a document is not necessary to defeat summary judgment, as Plaintiffs must only show that some material fact is in dispute, and need not affirmatively prove their case at this point.  However, as Defendants have fully responded to this "Counterstatement," and the Counterstatement helpfully cites to portions of the record, the Court sees no reason not to rely on the contents therein.

[4] In reviewing Mehr's claim under the NJCRA, the Court notes that he alleges that the "excessive force used by Defendants Moynihan and/or John Does 1-5 . . . deprived plaintiff of his substantive due process right to be free from unlawful seizure of his person and his fundamental right to liberty secured by the Constitution of the United States and the Constitution of the State of New Jersey."  (Compl. Count Four ¶ 2.)  To the extent Mehr meant to make out a separate claim for a violation of his substantive due process rights under the New Jersey Constitution, he makes no mention of this claim in his opposition to Defendants' motion for summary judgment.  Further, he describes his claim under the NJCRA as duplicative of his Fourth and Fourteenth Amendment claim for excessive force under § 1983.  (See Pl.'s Opp'n Br. 48.)  Accordingly, the Court construes Mehr's Complaint as alleging claims of excessive force in violation of his Fourth Amendment rights and his rights under N.J. Const. art. I ¶ 7, the Fourth Amendment's analog.  See Ingram v. Twp. of Deptford, 911 F. Supp. 2d 289, 301 (D.N.J. 2012) ("Article I, Paragraph 7 of the New Jersey Constitution protects individuals from excessive force by the police, using language nearly identical to the Fourth Amendment of the United States Constitution: "The right of the people to be secure in their persons ... against unreasonable searches and seizures, shall not be violated . . . .").

Michele Mehr asserts a state law claim against Moynihan for loss of consortium, society, or services (Count Seven). [5]

## II.    LEGAL STANDARD

Summary judgment is appropriate where the Court is satisfied that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 330 (1986).  A genuine dispute of material fact exists only if the evidence is such that a reasonable jury could find for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  When the Court weighs the evidence presented by the parties, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  Id. at 255.

The burden of establishing the nonexistence of a "genuine issue" is on the party moving for summary judgment.  Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1080 (3d Cir. 1996).  The moving party may satisfy its burden either by "produc[ing] evidence showing the absence of a genuine issue of material fact" or by 'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case."  Celotex, 477 U.S. at 325.

---

[5] "Although '[u]se of John Doe defendants is permissible in certain situations until reasonable discovery permits the true defendants to be identified,' these parties must be dismissed if such discovery does not reveal their proper identities." Cordial v. Atl. City, No. 11-1457, 2014 WL 1095584, at *3 (D.N.J. Mar. 19, 2014), recons. den., 2014 WL 2451137 (D.N.J. June 2, 2014) (citing Blakeslee v. Clinton Cnty., 336 F. App'x 248, 250 (3d Cir. 2009) (affirming district court's sua sponte dismissal of fictitious parties that were not identified after discovery)).  "This may be done upon motion of a party or the Court."  Id. (citing Fed. R. Civ. P. 21 ("On motion or on its own, the court may at any time, on just terms, add or drop a party.")).  Here, Plaintiffs have failed to amend their Complaint or otherwise identify any of these fictitious defendants despite the fact that discovery has now closed.  Thus, these parties shall be dismissed.

If the party seeking summary judgment makes this showing, it is left to the nonmoving party to "do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  Rather, to survive summary judgment, the nonmoving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex, 477 U.S. at 322.  Furthermore, "[w]hen opposing summary judgment, the nonmovant may not rest upon mere allegations, but rather must 'identify those facts of record which would contradict the facts identified by the movant.'" Corliss v. Varner, 247 F. App'x. 353, 354 (3d Cir. Sept. 17, 2007) (quoting Port Auth. of N.Y. and N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2002)).

In deciding the merits of a party's motion for summary judgment, the Court's role is not to evaluate the evidence and decide the truth of the matter, but to determine whether there is a genuine issue for trial.  Anderson, 477 U.S. at 249.  Credibility determinations are the province of the fact finder, not the district court.  Big Apple BMW, Inc. v. BMW of N. Am., Inc., 974 F.2d 1358, 1363 (3d Cir. 1992).

## III.    CLAIMS AGAINST MOYNIHAN

As noted above, Mehr brings claims against Moynihan for excessive force, assault and battery, and intentional infliction of emotional distress.[6]  Michele Mehr brings a claim against Moynihan for loss of consortium.  With respect to these claims, Moynihan contends that he is entitled to qualified immunity; he does not advance any alternative arguments.

---

[6] As to Mehr's excessive force claim under the federal and New Jersey constitutions, because his allegations are virtually identical and federal and New Jersey law governing these violations are substantially similar, the Court will address these claims together.  See Hedges v. Musco, 204 F.3d 109, 121 (3d Cir. 2000).

"The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Ray v. Twp. of Warren, 626 F.3d 170, 173 (3d Cir. 2010) (quoting Pearson v. Callahan, 555 U.S. 223 (2009)).  If a reasonable officer is not on notice that his or her conduct under the circumstances is clearly unlawful, then application of qualified immunity is appropriate.  Id. "Qualified immunity protects all but the plainly incompetent or those who knowingly violate the law."  Id.  "The immunities of municipalities and their officials sued directly under [the New Jersey Constitution] are identical to those provided by federal law."  Lloyd v. Borough of Stone Harbor, 432 A.2d 572, 583 (N.J. Super. Ct. Ch. Div. 1981); see also Ramos v. Flowers, 56 A.3d 869, 882 (N.J. Super. Ct. App. Div. 2012) ("qualified immunity is an affirmative defense under the [NJCRA]"); J.S. v. Lee, No. L-783-10, 2011 WL 1344997, at *3 (N.J. Super. Ct. App. Div. Apr.11, 2011) (applying the federal qualified immunity standard to address both federal section 1983 claims and state constitution claims under NJCRA).

The Supreme Court has established a two-part analysis to determine if qualified immunity is appropriate:  (1) whether the official's conduct violated a constitutional or federal right; and (2) whether the right at issue was "clearly established" at the time of defendant's alleged misconduct.  Pearson, 555 U.S. at 232.  Courts are permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first.  Id. at 236.  The right is "clearly established" only if the right was sufficiently clear such that a reasonable official would understand that what he is doing violates that right.  Ray, 626 F.3d at 174.  Even if the officer made a mistake about the legal constraints on his

actions, as long as the mistake was reasonable, qualified immunity still applies.  Id.  To avoid hindsight, the officer's actions are judged from the perspective of a reasonable officer under the circumstances.  Id.

### A.      Excessive Force – Counts One and Four

Claims that police officers used excessive force in an arrest are analyzed under the Fourth Amendment objective reasonableness standard.  Graham v. Connor, 490 U.S. 386, 388 (1989).  To state a claim for excessive force under the Fourth Amendment, a plaintiff must show that a "seizure" occurred and that it was unreasonable.  Curley v. Klem, 499 F.3d 199, 203 (3d Cir. 2007).  The test of Fourth Amendment reasonableness of force used during seizure is whether, under the totality of the circumstances, an officer's actions are objectively reasonable in light of facts and circumstances confronting him, without regard to his underlying intent or motivations.  Kopec v. Tate, 361 F.3d 772, 776 (3d Cir. 2004); Graham, 490 U.S. at 397.  An excessive force claim must be evaluated from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.  Rivas v. City of Passaic, 365 F.3d 181, 198 (3d Cir. 2004); Lamont v. New Jersey, 637 F.3d 177, 183 (3d Cir. 2011) ("Monday morning quarterbacking is not allowed").

In assessing whether the use of force was objectively reasonable, courts consider "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  Rivas, 365 F.3d at 198 (quotation marks and citation omitted).  Courts may also consider "the possibility that the persons subject to the police action are violent or dangerous, . . . the possibility that the suspect

11

may be armed, and the number of persons with whom the police officers must contend at one time." Kopec, 361 F.3d at 777.

While reasonableness is often a question for the jury, summary judgment in favor of defendants is appropriate "if the district court concludes, after resolving all factual disputes in favor of the plaintiff, that the officer's use of force was objectively reasonable under the circumstances." Id. (quoting Abraham v. Raso, 183 F.3d 279, 290 (3d Cir. 1999)).

New Jersey courts apply the federal standard when addressing excessive force claims brought under the state constitution. See State v. Ravotto, 777 A.2d 301, 306-307 (N.J. 2001) (applying the federal standard for both the federal and state constitutional claims); see also Watters v. Emery, No. L-19-05, 2008 WL 1820700, at * 3-4 (N.J. Super. Ct. App. Div. Apr. 24, 2008) (same); Norcross v. Town of Hammonton, No. 04-2536, 2008 WL 9027248, at *4 (D.N.J. Feb. 5, 2008) (finding that the excessive force standard under the New Jersey constitution is the same as under the federal constitution).

Here, Defendants argue that Moynihan is entitled to qualified immunity as to Mehr's excessive force claims because he was performing his job duties as a law enforcement officer when he arrested Mehr, Mehr refused to cooperate, and Mehr refused to leave the Casino after Moynihan asked him to do so.[7] (Defs.' Br. in Support of Mot. for Summ. J. ("Defs.' Br.") 6-7.) Defendants further argue that Mehr was "clearly acting violently and dangerously before, during and at the time of [ ] arrest." (Id. at 7.) According to Defendants, because Mehr's "noncompliance was drawing a crowd, causing an immediate threat to the safety of others as well as [Moynihan]," Defendants contend that Moynihan "clearly acted for the safety of himself

---

[7] Defendants also argue that Jubilee and Peterson are entitled to qualified immunity on Mehr's excessive force claims; however, these claims are brought solely against Moynihan. (See Compl. Counts One and Four.)

and others under the circumstances and used the necessary force to subdue and uncooperative, yelling, screaming out of control, and dangerous individual." (Id.)

Mehr responds that there is sufficient conflicting testimony among the parties to create genuine issues of material fact from which a jury could conclude that Moynihan acted unreasonably and used excessive force. (Pls.' Opp'n Br. 28.) The Court agrees.

Viewing the facts in the light most favorable to Mehr, a reasonable jury could conclude that Moynihan used excessive force during the course of Mehr's arrest.

While it appears that a large crowd gathered to observe the arrest, there is no evidence of record that this crowd interfered in the arrest or that Mehr was seeking the intervention of this group. Additionally, Moynihan appears to have been assisted by several security guards during the arrest, and there is no evidence that Mehr was armed.

According to Moynihan's version of the evening, Moynihan grabbed him without warning, he did not resist arrest, Moynihan ignored his pleas concerning his recently injured left wrist, and although he tried to comply with Moynihan's orders and put his hands behind his back, Moynihan's hold on his wrist prevented him from doing so. Mehr also states that after he was handcuffed and brought to his feet, Moynihan continued to tighten the handcuffs and move Mehr's injured arm, causing Mehr even more pain, each time Mehr told Moynihan that he had been injured.

If a factfinder were to accept this version of events, it would be reasonable to conclude that, under these circumstances, the use of handcuffs and physical force in a manner sufficient to dislocate a man's shoulder and break his arm, coupled with the continued tightening of handcuffs in order to inflict greater pain, would constitute excessive force. See, e.g., Watson v. Haverford

13

Twp. Police Dep't, No. 10-6731, 2012 WL 1900629 (E.D. Pa. May 25, 2012) (holding that based on plaintiff's version of the events, i.e., that the officer put plaintiff "face down on the table and yanked her hands behind her back," plaintiff purportedly told the officer "that he was hurting her, but he did not reply," two officers picked plaintiff up under arms and dragged her down the driveway to their police car with her feet barely touching the ground, and then screamed in plaintiff's ear and pushed her in the police car, a jury could find that the defendant officers used considerable force in arresting plaintiff); French v. Squire-Tibbs, No. 11-1009, 2013 WL 3283869, at *4 (D.N.J. June 26, 2013) (where there was "no indication, by Plaintiff's account, that he "actively resist[ed]" the officers when they entered the holding cell to subdue him . . . there was little "possibility that [he] may [have been] armed," and there "was only one potentially dangerous person with whom the officers had to contend" a factfinder could conclude that "the use of a billy club to the face with sufficient force to break a person's orbital bone would constitute excessive force in violation of the Fourth Amendment"); Kopec, 361 F.3d at 777 (reversing grant of summary judgment for arresting officer, and holding that use of force was excessive in violation of the Fourth Amendment, where plaintiff alleged that officer excessively tightened handcuffs and ignored his repeated requests to loosen them for ten minutes and that he suffered permanent nerve damage).

Having determined that a reasonable jury could conclude that Moynihan violated Mehr's constitutional rights, the Court must determine whether those rights were clearly established at the time Moynihan engaged in the allegedly unconstitutional conduct.  Based on the foregoing, and viewing the facts in the light most favorable to Mehr, the Court concludes that it cannot be said as a matter of law that a reasonable officer would not have known that twisting a man's arm

until his shoulder dislocated and his arm was broken, and then continuing to tighten handcuffs to inflict greater pain, was in violation of the Fourth Amendment, especially where this individual did not resist being placed in handcuffs and apparently did nothing to provoke the initial physical encounter with the officer.  See Williams v. Twp. of W. Deptford, No. 05-1805, 2008 WL 1809134, at *5 (D.N.J. Apr. 22, 2008) ("This Court concludes that it would have been clear to a reasonable police officer that three male officers lifting a woman in the air and throwing her on the ground with force sufficient to break a femur bone is unreasonable where that individual is alone, unarmed, outnumbered by police eight to one."); Klemash v. Monroe Twp., No. 07-4190, 2010 WL 455263, at *8 (D.N.J. Feb. 4, 2010) (noting that where defendant was told repeatedly that plaintiff was unable to move his arm behind his back, and the offense was minor, it was clear that a reasonable officer would have known his conduct was unlawful under the circumstances).

Accordingly, the Court will deny Defendants motion for summary judgment on Mehr's excessive force claims against Moynihan.[8]

### B.    Claims for Assault and Battery, Intentional Infliction of Emotional Distress, and Loss of Consortium – Counts Five, Six, and Seven

Mehr next alleges that Moynihan committed assault and battery by physically injuring him "and/or by putting him in reasonable apprehension of serious and imminent bodily harm." (Compl. Count Five ¶ 2.)  Mehr also alleges that Moynihan's actions caused him extreme emotional distress.  (Id. Count Six ¶¶ 2-3.)  Meanwhile, Michele Mehr alleges that due to

---

[8] "Qualified immunity may still be available at trial in light of the jury's findings of facts."  Klemash, 2010 WL 455263, at *8 n.3 (citing Halpin v. Gibson, No. 05-2088, 2009 WL 3271590, at *2-3 (D.N.J. Oct. 9, 2009) (considering a post-trial motion for qualified immunity)).

Moynihan's actions, she was and will continue to be "deprived of the services, society, and consortium of her husband."  (Id. Count Seven ¶ 3.)

In one sentence, Defendants reference the qualified immunity argument advanced in connection with Mehr's excessive force claims against Moynihan and state that qualified immunity is also appropriate as to all of Plaintiffs' state law claims.  They advance no other arguments.

Based on the Court's conclusion supra, however, qualified immunity is not available at this time.  As Defendants has failed to advance any alternative arguments as to why summary judgment is warranted on Plaintiffs' state law claims, the Court will deny Defendants' motion for summary judgment as to Counts Five, Six, and Seven.

## IV.   CLAIMS AGAINST ATLANTIC CITY, JUBILEE, AND PETERSEN

Atlantic City, Jubilee, and Petersen seek summary judgment on Mehr's § 1983 claims for municipal liability arguing that Mehr cannot produce evidence sufficient to establish a custom, policy, or practice of failing to train or supervise police officers.  (Defs.' Br. 9.)  Defendants do not move against Mehr's claims against Petersen and Jubilee in their official and individual capacities.[9]

---

[9] Rule 56 states that "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a).  First, Defendants fail to move against—or even mention—Plaintiff's claims against Jubilee or Petersen in their official and individual capacities.  Second, although Defendants argue in their Reply Brief to Plaintiffs' Opposition, that Plaintiff's claim "for municipal liability" against Petersen should be dismissed because Mehr has failed to show that Petersen "was a policy maker that was deliberately indifferent to unlawful customs, policies, practices and procedures within defendant Atlantic City Police Department," (Defs.' Reply Br. 8), it is well established that "[a] moving party may not raise new issues and present new factual materials in a reply brief that it should have raised in its initial brief."  Ballas v. Tedesco, 41 F. Supp. 2d 531, 533 n.2 (D.N.J. 1999); see also Dana Transport, Inc. v. Ableco Finance, LLC, No. 04-2781, 2005 WL 20000152, at *6 (D.N.J. Aug. 17, 2005) (explaining that "arguments raised for the first time in defendant's reply brief will be disregarded").

Mehr argues that he has produced sufficient evidence to show that Atlantic City had a shallow Internal Affairs process as to complaints for excessive force and that this process caused his injuries, that Atlantic City acquiesced in the use of excessive force by its officers, and that the number of Internal Affairs complaints and lawsuits filed against Moynihan and other police officers are sufficient to show that Atlantic City police officers are inadequately trained and that

---

The Court notes, however, that Defendants would likely be entitled to summary judgment on Mehr's official capacity claims against Petersen and Jubilee. See Duran v. Warner, No. 07-5994, 2013 WL 4483518, at *6 (D.N.J. Aug. 20, 2013) (dismissing official capacity claims against Chief of Police where identical claims were asserted against the municipality); see also Rodriguez v. City of Camden, 09-1909, 2011 WL 345918, at *5 (D.N.J. Feb. 2, 2011) (citing Dull v. W. Manchester Twp. Police Dep't, No. 07-0307, 2008 WL 717836, at *7 (M.D. Pa. Mar. 17, 2008) ("Claims asserted against both a government entity and the entity's agents in their official capacity warrant dismissal of the redundant official-capacity suits.").

Additionally, there might be an issue as to whether Jubliee and Petersen can be said to have engaged in misconduct sufficient to hold them liable in their individual capacities.

A government official may be held liable under § 1983 for his own misconduct if (1) as a policymaker, he "with deliberate indifference to the consequences, established and maintained a policy, practice or custom which directly caused [the] constitutional harm," or (2) he "participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations." A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenille Detention Ctr., 372 F.3d 572, 586 (3d Cir. 2004) (internal citations omitted). To impose liability under the knowledge and acquiescence theory, there must be "both (1) contemporaneous knowledge of the offending incident or knowledge of a prior pattern of similar incidents, and (2) circumstances under which the supervisor's assertion could be found to have communicated a message of approval to the offending subordinate." Chinchello v. Fenton, 805 F.2d 126, 133 (3d Cir. 1986). The Third Circuit has noted that "the connection between the supervisor's directions and the constitutional deprivation must be sufficient to demonstrate a plausible nexus or affirmative link between the directions and the specific deprivation of constitutional rights at issue."

The record currently before the Court indicates that Jubilee was Deputy Police Chief from 1991 until sometime after May 27, 2010, when he was appointed Acting Chief of Police following Chief of Police John J. Mooney's resignation. (See Pls.' SMF ¶¶ 39-40.) Although, as discussed infra, Jubilee testified that the Chief of Police would be responsible for reviewing Internal Affairs complaints, (id. ¶ 49), and the complaints submitted by Mehr indicate that the Chief of Police then forwards these complaints to the prosecutor's office, (Ex. V. to Pls.' Opp'n Br.), the time period at issue here corresponds chiefly to Mooney's tenure in office, and not Jubilee's. Although Jubilee was acting Chief in the year proceeding Mehr's 2011 encounter with Moynihan, it is possible Jubilee did not actually establish and maintain a policy, practice or custom, which directly caused the alleged constitutional harm. Further, although the Chief of Police bears the ultimate responsibility for Internal Affairs investigations, and would have actual knowledge of the excessive force complaints filed against police officers, it is unclear to what extent Jubilee was aware of the complaints against Moynihan which were filed prior to Jubilee's appointment as acting Chief and then Chief. As to Petersen, the record reveals that she was not appointed Public Safety Director until March 1, 2010. (Pls.' SMF ¶ 53.) Petersen also testified that in this position, and as a civilian, she was not involved with "Internal Affairs, whether it be policy making or otherwise." (Id.) All of that being said, however, as Defendants' failed to raise any of these issues in their motion papers, the Court declines to address them further.

Atlantic City was aware that its officers needed better "use of force" training.  (Pls.' Opp'n Br. 33-47.)

## A.  Municipal Liability – Count Two

It is axiomatic that a plaintiff may not hold a municipal entity liable under 42 U.S.C. § 1983 on a theory of respondeat superior.  See Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 691 (1978).  Instead, a viable § 1983 municipal liability claim must include allegations that a government entity has adopted a particular policy or custom, "whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy," and that such policy or custom has been "the moving force" behind the deprivation of an individual's constitutional rights.  Id. at 694.  Municipal policy generally involves a "statement, ordinance, regulation, or decision officially adopted and promulgated by [a local governing] body's officers"; municipal customs, however, may take less conspicuous form.  See Simmons v. City of Phila., 947 F.2d 1042, 1059 (3d Cir. 1991) (citing Monell, 436 U.S. at 690).  A municipal custom, although lacking the formal approval of a policy, refers to those official practices which are "'so permanent and well settled' as to have the force of law."  Id. (citing Monell, 436 U.S. at 691).

Under certain circumstances, a municipality's failure to properly train its employees and officers can amount to a "custom" that will trigger liability under section 1983.  See City of Canton v. Harris, 489 U.S. 378, 388 (1989).  However, such liability is reserved for cases in which the failure to train evidences a "deliberate indifference" to the constitutional rights of that municipality's inhabitants.  Id. at 389.  It is not enough to allege simply that a training program exists and that it has proved to be inadequate.  Id. at 390.  Rather, the plaintiff's burden is to

"identify a failure to provide specific training that has a causal nexus with his or her injuries and

. . . demonstrate that the absence of that specific training can reasonably be said to reflect a

deliberate indifference to whether the alleged constitutional deprivations occurred." Reitz v.

Cnty. of Bucks, 125 F.3d 139, 144 (3d Cir. 1997).  Deliberate indifference may be established

when a policymaker has knowledge of a "pattern of similar constitutional violations by untrained

employees" but takes no action to augment or alter the municipality's employee training

programs accordingly.  See Lapella v. City of Atl. City, No. 10-2454, 2012 WL 2952411 at *7

(D.N.J. July 18, 2012) (citing Connick v. Thompson, 131 S. Ct. 1350, 1360 (2011)).

        While the Supreme Court originally fashioned the "deliberate indifference" doctrine in

the context of a city's alleged failure to properly train its police officers, the Third Circuit has

since adopted this standard in other policy and custom situations.  Beck v. City of Pittsburgh, 89

F.3d 966, 972 (3d Cir. 1996).  In general, a municipality may be liable under § 1983 if it tolerates

known illegal conduct by its employees.  Id.  In such circumstances, it can be said to have a

custom that evidences deliberate indifference to the rights of its inhabitants if (1) policymakers

were aware that municipal employees had deprived others of certain constitutional rights; (2) it

failed to take precautions against future violations; and (3) this failure led, at least in part, to the

plaintiff's suffering the same deprivation of rights.  See id. (citing Bielevicz v. Dubinon, 915

F.2d 845, 851 (3d Cir. 1990)).  Thus, in the context of a plaintiff who alleges that a municipal

employee violated his constitutional rights through the use of excessive force, he may state a §

1983 claim against the municipality itself if he alleges that employees had used excessive force

against individuals in the past, that the municipality was well aware of these occurrences, that the

municipality failed to take action[10] to prevent future violations, and that this failure contributed in part to the plaintiff's being himself subjected to excessive force.

Mehr asserts that Atlantic City should be held liable due to its custom of failing to remedy police officers' use of excessive force as demonstrated by its employment of an inept internal affairs process used to investigate complaints regarding police misconduct and abuse. "This is a recognized theory of municipal liability." Cordial v. Atlantic City, 2014 WL 1095584, at*4-7 (D.N.J. March 19, 2014), recons. den., 2014 WL 2451137 (D.N.J. June 2, 2014) (stating, inter alia, that there was a genuine issue of material fact as to Plaintiff's municipal liability claim where he had "presented sufficient evidence . . . regarding whether Atlantic City has a custom of acquiescing in the use of excessive force by its officers" and "evidence from which a reasonable jury could infer that the [Police Department's] [Internal Affairs] investigation process [wa]s designed to insulate [ ] accused officers from penalty"); see also Beck, 89 F.3d at 973-76 (holding that the plaintiff had presented sufficient evidence to permit a jury to infer that the City "knew about and acquiesced in a custom tolerating the tacit use of excessive force by its police officers" by showing that the officer in question had "five complaints of excessive force in less than five years," all of which alleged similar misconduct by the officer, by offering annual reports showing a high rate of excessive force complaints throughout the police department, and by producing evidence that the internal investigation process was "shallow" and flawed).

First, the Court agrees that Mehr has presented sufficient evidence to demonstrate genuine issues of material fact regarding whether Atlantic City has a custom of acquiescing in

---

[10] Examples of failures to take action include a failure to properly investigate excessive force claims, e.g., Franks v. Cape May Cnty., No. 07-6005, 2010 WL 3614193, at *11 (D.N.J. Sept. 8, 2010), or a failure to meaningfully discipline the employees responsible. e.g. Merman v. City of Camden, 824 F. Supp. 2d 581, 588-90 (D.N.J. 2010).

the use of excessive force by its officers.  Specifically, Mehr presented evidence that from 2005 until 2010, 509 excessive force complaints were lodged with Internal Affairs.  (Pls.' SMF ¶ 45 (citing Exhibit N to Pls.' Opp'n Br.).)  Within this time frame, Moynihan has been the subject of twelve (12) excessive force Internal Affairs complaints dating from June 2006 to May 2009.  (Id. ¶ 97 (citing Exhibit V to Pls.' Opp'n Br.).)  A review of the complaints lodged against Moynihan reveal similar conduct to that alleged by Mehr.  Illustratively, one complainant alleged that Moynihan used excessive force in the course of an arrest, another alleged that while she was detained the officer[11] "quickly grabbed her arm and twisted it . . . [and then she] started crying and said to the officer that he was breaking her arm."  (Id.)  Finally, another complainant stated that Moynihan pushed him into a wall and twisted his handcuffs in order to inflict pain.  (Id.) The handcuffs were tightened again, inflicting "extreme pain," after the complainant was placed in an investigation room at the police station.  (Id.)

Jubilee testified that it is the Chief of Police's responsibility to review all Internal Affairs complaints filed against police officers.  (Pls.' SMF ¶ 49.)  These complaints were then forwarded to the prosecutor's office.  (Ex. V. to Pls.' Opp'n Br.).  Additionally, according to the Atlantic City Police Department's General Orders governing Internal Affairs investigations, an officer having three (3) Internal Affairs complaints filed against him or her in a year triggers a review of that officer's Internal Affairs records.  (Pls.' SMF ¶¶ 78-80.)  Three internal affairs complaints filed against an officer within a three-month period triggers the "Early Warning

---

[11] It is not specified that this officer was Moynihan, however, the Complaint charges three officers with excessive force and Moynihan was the only male officer charged of the three.  (See Ex. V to Pls.' Opp'n Br. at DM-00438-49 ("The officer placed his had around the back of her neck . . . .").)

System," which means that the officer is then monitored by his or her supervisors.  (Id. ¶¶ 81-82.)

 John J. Mooney, who served as Chief of Police of the Atlantic City Police Department from December 2005 until May 2010, testified that the Early Warning System puts "commanders on notice that if there are allegations of excessive force, that they should be monitoring the behavior of the particular employee."  (Id. ¶ 82.)  Moynihan triggered the Early Warning System several times.[12]  (Id. ¶¶ 100-102.[13])  Based on the foregoing, a reasonable jury could infer "that the Chief of Police knew, or should have known, of [Moynihan's] propensity for violence when making arrests."  Beck, 89 F.3d at 973; see also Cordial, 2014 WL 1095584, at*4-5 (stating the same where Chief of Police received Early Warning System memoranda which mentioned a certain officer and set forth consistent allegations concerning his alleged use of excessive force).

 Second, Mehr has also presented evidence from which a reasonable jury could conclude that Atlantic City employed a shallow Internal Affairs investigation process.  The record shows that Internal Affairs investigators often relied on written statements from police officers, witnesses, and complainants, rather than conduct in-person interviews.  (See generally, Ex. V. to Pls.' Opp'n Br.)  Indeed, a number of the Internal Affairs investigations reports seemed to favor a police officer's rendition of events when his or her account remained consistent across these

---

[12] It appears that the Early Warning System reviews all Internal Affairs complaints made against an officer, not just complaints for excessive force.  (See Pls.' SMF ¶ 80.)  Moynihan triggered the system three times.  The first time, there were five complaints, three of which were for excessive force.  The second time, Moynihan accumulated three complaints, two of which were for excessive force.  The third time, Moynihan accumulated four complaints, three of which were for excessive force.  (See Ex. X to Pls.' Opp'n Br.)

[13] Defendants deny the first of these statements in their Response to Plaintiffs' Statement of Material Facts, but the substance of their response is totally unrelated to this statement.  (See Defs.' Response to Pls.' SMF ¶ 100 ("Denied. There were no violations of the Guidelines as they are guildelines only."); ¶ 101 ("Admit that Defendant Moynihan was named as a defendant.").)

written reports.  (Id.)  Although it was department policy to interview officers under

investigation and obtain statements from them rather than reviewing their written complaints,

Captain Timothy J. Friel, a former Internal Affairs investigator, testified that it was "often left up

to the assigned investigator to decide whether they would need to do a formal interview or not."

(Pls.' SMF ¶ 73 (citing Ex. M to Pls.' Opp'n Br. (Friel Dep.) 52:12-54:16.)

 Jubilee testified that Internal Affairs reviews all internal complaints made against its

officers, regardless of outcome, for evidence of a pattern of misconduct, and is required to

review the target officer's prior and subsequent Internal Affairs complaints to see if an officer's

conduct evinces such a pattern.  Captain Friel testified, however, that the department does not

have a regular practice to review an officer's prior and subsequent complaints to determine if this

pattern might exist and does not do so on a regular basis.  (Pls.' SMF ¶¶ 85-86.)

 Based on this evidence, a reasonable jury could infer that Internal Affairs investigations

were insufficient or inadequate, and that Atlantic City's failure to conduct more thorough

investigations displayed a deliberate indifference to the risk that its officers would use excessive

force during the course of arrests.

 Finally, as to Mehr's failure to train claim based on the number of Internal Affairs

complaints involving excessive force against the police department as a whole, and as to

Moynihan specifically, Mehr has produced sufficient evidence from which a reasonable jury

could infer that Atlantic City had knowledge of a pattern of similar constitutional violations by

untrained employees, but took no action to augment or alter its training programs accordingly.

See Lapella v. City of Atl. City, No. 10-2454, 2012 WL 2952411, at *7 (D.N.J. July 18, 2012)

(citing Connick v. Thompson, 131 S. Ct. 1350, 1360 (2011)).  Although the Chief of Police

23

reviews all Internal Affairs complaints and the Internal Affairs unit reports directly to the Chief of Police, (Pls.' SMF ¶¶ 49-50), it is unclear whether anyone ever spoke with Moynihan about the number of complaints that were brought against him for excessive force.  (Ex. U. to Pls.' Opp'n Br. (Jubilee Dep.) 50:8-12.)

Based on the foregoing, a reasonably jury could infer that the repeated excessive force complaints filed against Atlantic City police officers should have put Atlantic City on notice that its police officers required additional training as to the use of proper force, and that without further training, the type of constitutional violations identified by Mehr would continue to occur. See Berg v. Cnty. of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000) ("Failure to adequately screen or train municipal employees can ordinarily be considered deliberate indifference only where the failure has caused a pattern of violations").

Accordingly, Defendants' motion for summary judgment on Mehr's claims under § 1983 for municipal liability will be denied.

## V.   PROSPECTIVE INJUNCTIVE RELIEF AGAINST ALL DEFENDANTS – COUNT THREE

In addition to seeking damages, Mehr also seeks prospective injunctive relief against all Defendants in Count Three of his Complaint.  Defendants have moved for summary judgment on this count arguing in a conclusory fashion that because "Atlantic City is not liable to Plaintiff under § 1983, and further since Police Officer Moynihan's actions are protected by qualified immunity, Plaintiff's § 1983 demand for prospective injunctive relief is without merit . . . [and] should be dismissed." (Defs.' Br. 10.)  Defendants do not reference Mehr's claim for prospective injunctive relief against Jubilee and Petersen.

As noted above, Mehr has produced sufficient evidence in support of his excessive force and municipal liability claims.  Accordingly, this argument is without merit.  However, Mehr's claim for prospective injunctive relief fails for another reason.

It is axiomatic that a plaintiff must demonstrate standing for each form of relief sought.  Friends of the Earth, Inc. v. Laidlaw Envt'l Servs. (TOC), Inc., 528 U.S. 167, 185 (2000).  Equitable remedies are unavailable absent a showing of irreparable harm, which cannot be met without a showing of a real or immediate threat that the plaintiff will be wronged again.  City of Los Angeles v. Lyons, 461 U.S. 95, 111 (1983).

Here, Mehr'r claim for injunctive relief is based entirely on past harm.  As this harm lacks the "high degree of immediacy required to constitute injury in fact and provide Article III standing" for prospective relief, Pa. Prison Soc. v. Cortes, 508 F.3d 156, 166 (3d Cir. 2007) (citing Defenders of Wildlife v. Lujan, 504 U.S. 555 (1992)), and Mehr has failed to show a likelihood that he himself will be harmed again by Defendants in the near future, his claim for injunctive relief necessary fails.  Lundy v. Hochberg, 91 F. App'x. 739, 743 (3d Cir. 2003).

Accordingly, the Court will grant Defendants' motion as to Count Three.  See Blakeney v. Marsico, 340 F. App'x 778 (3d Cir. 2009) (affirming District Court's sua sponte dismissal of complaint for lack of Article III standing for prospective injunctive relief).

**IV.    CONCLUSION**

      For the reasons stated above, the Court will grant in part and deny in part Defendants'

motion.  An appropriate order shall issue today.


Dated: _9/2/2014_____                                  s/ Robert B. Kugler___
                                                        ROBERT B. KUGLER
                                                        United States District Judge

26